IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| BOBBY R. BROWN, Individually and on Behalf of all others similarly situated,<br>　　*Plaintiffs,*<br><br>v.<br><br>DR. GEORGE J. BETO, Individually and as Director of the Texas Department of Corrections, C. L. McADAMS, Individually and as Warden of the Ellis Unit of Said Department and BOBBY E. TAYLOR, Individually and as Assistant Warden of the Ellis Unit of said Department,<br>　　*Defendants.* | §§§§§§§§§§§§§§§§<br><br>CIVIL ACTION NO. 4:69-cv-0074 |

**SUCCESSOR DEFENDANTS' RESPONSE IN OPPOSITION TO
TEXAS CIVIL RIGHTS PROJECT'S "MOTION TO BE APPOINTED AS COUNSEL
FOR DISSENTING CLASS MEMBERS"**

**TO THE HONORABLE JUDGE OF THE DISTRICT COURT:**

Successor Defendants, through the Attorney General for the State of Texas, file this Response in Opposition to Texas Civil Rights Project's "Motion to be Appointed as Counsel for Dissenting Class Members" (D.E. 169) and offer the following:

**I. INTRODUCTION**

1.　Bobby R. Brown is the named plaintiff in this class action suit, *Brown v. Beto*, against Defendants, originally brought in the late 1960s. Plaintiffs, a class of all past, present, and future Muslim state prisoners, alleged that Texas state prison policy abridged their free exercise of religion in regard to the practice of Islam. A consent decree was issued in 1977. (D.E. 53).

2.　Pursuant to the findings entered in *Scott v. Pierce,* (S.D. Tex., cause no. 4:07–CV–03991), the Texas Department of Criminal Justice (TDCJ) filed its "Motion to Terminate Consent Decree" in this case on August 1, 2012. (D.E. 130). **Exhibits A** through **Exhibit I** attached to DE 130 are

fully incorporated herein as if they were attached herein and relied upon in connection to this response.

3. Class Plaintiff Brown responded to the motion by agreeing that 20 of the 22 provisions of the Consent Decree no longer need to be enforced.[1] As to the remaining two provisions, Class Representative Brown took issue with Section 15, which guarantees adherents to the Religion of Islam "at least two (2) full hours of time for worship services or other religious activities each week, rather than the one (1) hour previously permitted." Class Representative Brown also argued that the Consent Decree should remain in effect as to religious services permitted by Section 8 <u>without</u> a chaplain or approved volunteer to supervise the services. However, Section 8 does not permit Muslim offenders to meet without this supervision. Rather, Section 8 states in relevant part, "allow inmates professing adherence to the Religion of Islam to congregate <u>under appropriate supervision</u>." TDCJ deems "under appropriate supervision" to be either a chaplain or an approved volunteer pursuant to TDCJ A.D. 7.30. TDCJ intends to require offenders of the Muslim faith, as required with all other faiths in TDCJ, to meet under the supervision of a chaplain or approved volunteer.

4. In accordance with the automatic stay provisions of the PLRA, 18 U.S.C. § 3626(e)(1)(2), this Court "stayed" proceedings in this case on August 31, 2012, 30 days after the filing of the Motion to Terminate Consent Decree.

5. Movants are attorneys with the Texas Civil Rights Project, who on April 24, 2013, filed their "Motion to be Appointed as Counsel for Dissenting Class Members." Movants ask to be appointed counsel for eight dissenting prison inmates, who are considered a part of the class represented by

---

[1] Movants' argument that the Class Representative argues in favor of preserving one of the 22 provisions (p. 1 of Motion) is incorrect.

named plaintiff Bobby Brown but do not wish to continue relying on the class representative. (D.E. 169).

## II.  BACKGROUND

On July 20, 1977, in the course of civil litigation regarding the free exercise rights of Muslim inmates in Texas prisons, the district court entered a consent decree between Plaintiffs, certified as a class of "all past, present, and future inmates at the Texas Department of Corrections who profess to adhere to the principles of the Religion of Islam" and Defendants, state officials who administered the Department and who operated one of its prison units. Consent Decree, Doc. No. 53 (July 20, 1977) (attached to Motion to Terminate Consent Decree as **Exhibit A**[2]). The consent decree requires "Defendants, their agents, employees and successors" to:

1. Allow any ordained Islamic minister to hold and conduct Islamic religious services, teach classes in the Religion of Islam, teach Sunday School, and teach courses in Islamic ethics, language and beliefs; provided, however, that such Islamic ministers shall be approved by the Texas Department of Corrections, and provided further, however, that the Texas Department of Corrections shall not unreasonably withhold or delay approval of any ordained Islamic minister.

2. Allow Islamic ministers to counsel with inmates and conduct religious services at each unit of the TDC incarcerating adherents to the Religion of Islam.

3. Allow adherents of the Islamic faith to purchase, receive, possess and to share with other persons, Islamic religious literature, including the newspaper <u>Muhammad Speaks</u>, unless it can be clearly demonstrated that a specific issue or particular item of such literature will substantially disrupt prison discipline or security.

4. Allow adherents of the Islamic faith to purchase, receive, possess and share with other persons <u>The Holy Qu-Ran</u> by Usef Ali, and the books <u>Message to the Black Man</u> by Elijah Muhammad and <u>How to Eat to Live</u> by that same author.

5. Allow adherents of the Religion of Islamic to purchase, receive, possess and share with other persons, other books, pamphlets, papers and literature relating to the Religion of Islam, unless it can be clearly demonstrated that a particular item of such literature will substantially disrupt prison discipline or security.

---

[2] The original Consent Decree is printed on 11"x8" paper. To conform to today's rules regarding paper sizes, the copy that is marked as Docket Entry 53 is being used.

6. Allow adherents of the Religion of Islam to purchase, receive and possess religious medals and other memorabilia of their religion, in accordance with the same rules and practices applied to adherents of the Catholic, Jewish and Protestant faiths, which rules and practices prohibit possession of metal and memorabilia which create a security hazard.

7. Provide at least one prison library copy of <u>The Holy Qu-Ran</u> by Usef Ali for each unit of the Texas Department of Corrections (if not heretofore so provided), in accordance with the institutional library rules of the Texas Department of Corrections.

8. Whenever an ordained Islamic minister is unavailable at a particular time regularly scheduled for Islamic worship or study (as set forth in Item No. 1 above and No. 15 hereinafter), allow inmates professing adherence to the Religion of Islam to congregate under appropriate supervision for the purposes of worship, study in the Islamic faith, Sunday School and other religious functions and activities as set forth hereinabove and hereinafter, with a leader designated from their midst; provided, however, that such inmate leader shall have previously secured the approval of an appropriate official of the Texas Department of Corrections, and provided further, however, that the Texas Department of Corrections shall not unreasonably withhold or delay such approval.

9. Make available to inmates adhering to the Religion of Islam adequate use of facilities at each unit of the Texas Department of Corrections for the purposes of carrying out the religious programs and activities hereinabove and hereinafter enumerated on the same basis as is done for Catholic, Jewish and Protestant faiths.

10. Allow Islamic ministers the same access to offices and facilities of the Texas Department of Corrections as are made available to other visiting ministers of Catholic, Jewish, Protestant and other faiths.

11. Provide adequate use of facilities and an opportunity for ordained and approved Islamic ministers to counsel and confer privately and confidentially with inmate adherents to the Religion of Islam, on the same terms and condition as applied to Catholic, Protestant and Jewish inmates and ministers. If such is not presently the practice, the TDC shall provide adequate use of facilities and an opportunity for visiting ordained and approved ministers of Catholic, Protestant and Jewish religions to counsel and confer privately and confidentially with inmate adherents of their respective religions.

12. Allow prompt distribution to inmates of literature brought into the units of the Texas Department of Corrections by visiting Islamic ministers; provided, however, that appropriate officials of the Texas Department of Corrections shall have the right to inspect the materials prior to distribution on the same basis as is applied to the distribution of literature brought into the units by visiting ministers of the Catholic, Jewish and Protestant faiths, and provided further, that the distribution of specific items of such materials can be barred only if (i) it can be shown that such action furthers the interests of security, order or rehabilitation, (ii) the barring of such literature is unrelated to the suppression of expression or the elimination of

unflattering or unwelcome opinions or factually inaccurate statements, and (iii) the limitation is no greater than is generally necessary or essential to the protection of the particular governmental interest involved.

13. Establish and maintain reasonable administrative procedures where by any duly ordained Islamic minister, after approval of the Texas Department of Corrections (which approval shall not be unreasonably withheld or delayed) shall be issued an identification card which will permit such minister to enter all units of the Texas Department of Corrections as a visiting Islamic minister and gain admission at such units as well as access to inmate adherents to the Religion of Islam, all on the same terms and conditions as are enjoyed by visiting ministers of the Catholic, Jewish and Protestant faiths.

14. Permit inmates to write to and correspond with Islamic ministers without having placed the name of such minister on the inmate's correspondence list and without reduction of the number of other persons the inmate can otherwise correspond with; provided, however, that prior to allowing such correspondence appropriate officials of the Texas Department of Corrections shall have a reasonable opportunity to verify that such purported minister is in fact a bona fide Islamic minister who does not pose a real and legitimate threat to prison security, order or rehabilitation; and provided further, however, that approval for corresponding with such minister shall not thereafter be unreasonably withheld or delayed.

15. Allow adherents to the Religion of Islam at each unit of the Texas Department of Corrections equal time for worship services and other religious activities each week as is enjoyed by adherents to the Catholic, Jewish and Protestant faiths, and specifically, allow adherents to the Religion of Islam at least two (2) full hours of time for worship services or other religious activities each week, rather than the one (1) hour previously permitted.

16. Discontinue use of the "card system" to the extent, if any, which may have existed in certain units of the Texas Department of Corrections which prohibited an inmate from attending religious services or activities unless he previously had acquired a card designating such religion as his faith; and affirmatively, allow any inmate to attend any religious service he or she chooses, irrespective of prior designation of faith or profession (or lack thereof). However, the Warden of any Unit, with the approval of the Director, may utilize a card or pass system to control movements to and from various portions of the unit for the purpose of attending religious services. Under such system, unit officials may require that an inmate who wishes to attend a particular religious service or activity, including Islamic services, obtain a card or pass from designated personnel authorizing attendance at such activity. The issuance of such cards will not require an affirmative designation of such religion as the inmate's professed faith. A refusal to issue such a card shall be based only upon a substantial risk that the inmate's attendance at a particular religious service or activity will disrupt prison discipline or security and for no other reason.

17. Allow inmates to discuss their religion between themselves and with other inmates without discouragement, prohibition, punishment or other disciplinary action.

18. Allow inmates to speak and teach the Islamic or Arabic language without discouragement, prohibition, punishment or other disciplinary action.

19. Refrain from segregating inmates on the basis of religion or assigning inmates to particular units within the Texas Department of Corrections on the basis of religion, except that the TDC may, upon the inmate's request and with the consent of the TDC, assign adherents of the Islamic faith to the same living quarters to facilitate exercise of their religious beliefs.

20. Employ a duly ordained Islamic minister as a full-time employee of the Texas Department of Corrections, with all of the salary, expense allowances, benefits and accoutrements as are generally enjoyed by regularly employed chaplains of the Texas Department of Corrections according to the following formula: At such time as the number of inmates designating the Religion of Islam (or one of its sects, such as Muslim or Moslem) as their religious preference multiplied by the number of designated chaplain positions authorized by the Texas Legislature in the then most current TDC appropriations bill and divided by the total number of inmates throughout the TDC system who designate a particular religious preference, is equal to or greater than one (1), the next chaplain hired (either by additional authorization of positions in an appropriations bill or by retirement, resignation, termination or other situation crating a vacancy in a currently authorized position) shall be a minister of the Religion of Islam, selected on the same criteria and guidelines as are used to select other chaplains in the Texas Department of Corrections. In the event that the ratio changes, either by an increase in the number of inmates or an increase in the number of chaplain positions in the appropriations bill, the ration will be computed by the same method. Notwithstanding the formula stated above, the TDC will employ a duly ordained Islamic minister as a full-time employee of the Texas Department of Corrections on the same terms set forth above on or before December 31, 1977, if such is reasonably possible.

21. It is agreed that TDC will designate, by means of an asterisk or in some other suitable manner, on posted, accurate and current menue boards at every prison unit each item on the menue for each meal which the steward or other person in charge of preparing the food for each meal has reasonable grounds to believe contains or was prepared in pork or a pork by-product. Further, TDC will make a reasonable, <u>bona fide</u> effort, based on presently available supplies and budgetary restrictions for the biennium starting September 1, 1977, and thereafter, to provide a main entrée at one meal at least once every 72 hours that is not pork meat; and, further, based on the considerations stated above, TDC will utilize its best efforts to provide a healthful and nutritious daily diet for all inmates who decline to eat pork and food prepared in and with pork by-products.

22. Notify the inmate population of the entry of this Consent Decree by posting a copy hereof (or a complete summary of the provisions hereof) on the bulletin board of each wing of each unit of the Texas Department of Corrections and by printing either this Consent Decree or such summary in the prison newspaper, THE ECHO.

Consent Decree, Doc. No. 53, at 4-14.

The consent decree has remained in force, unmodified, since 1977, and TDCJ has consistently adhered to all of its terms until the Order in *Scott* recently required that the Muslim inmates come under TDCJ AD-7.30 in regard to religious programing which offsets the type of supervision and the number of hours of religious service.

TDCJ readily admits that during the 35 years of adhering to the terms of the Consent Decree, it has allowed Muslim services to be conducted from time to time or unit to unit, without appropriate supervision. Unfortunately, this has created a situation in which Muslim inmates received more hours of religious programing than other faith groups that are required to have appropriate supervision. TDCJ was sued for disparate treatment in *Scott v. Pierce,* Cause No. 4:09-cv-399, Southern District of Texas - Houston Division (Jehovah's Witness inmate successfully complained that Muslim inmates received preferential treatment over other faith groups because they were allowed to meet without a chaplain or religious volunteer).[3]

In accordance with the Order in *Scott v. Pierce,* TDCJ recently began the process of equalizing the use of state resources to provide religious services to all faith groups equally and fairly. TDCJ grouped the 243 religious preferences into 11 religious categories. TDCJ provides one (1) hour of religious services per week to all 11 religious categories, including the Muslim religion, supervised by a state paid resource in accordance with TDCJ's A.D. 7.30. Currently, Muslim inmates receive one hour per week of religious services unless there is an outside volunteer available

---

[3] On May 7, 2012, the district Court in *Scott v. Pierce* entered its Order, holding that TDCJ was violating the Establishment Clause of the First Amendment because it was preferring one religious denomination over another, in this instance, the Muslim faith over all others. The district court noted that religious programming for Muslims was controlled by the *Brown v. Beto* consent decree while other faith groups are required to comply with TDCJ Chaplaincy policy, A.D.- 7.30. According to the district court, since Muslim groups were permitted to meet without the presence of a chaplain or a volunteer per the consent decree, TDCJ was discriminating against other faith groups by requiring them to be supervised by a chaplain or volunteer for all religious activities.

to lead the services.  *See,* attached **Exhibit M** (Oral Deposition of Billy Denton Pierce, p. 29, line 21 through p. 30, line 9) and the attached **Exhibit N** (third affidavit of Martin Dunbar).

## II.  EVIDENCE OF COMPLIANCE WITH CONSENT DECREE

As shown in the Motion to Terminate Consent Decree (D.E. 130), the undisputed evidence reveals that TDCJ is in compliance with the provisions of the Consent Decree, except as to the change in number of hours of religious services per week for Muslim inmates to comply with the Order in *Scott,* i.e. not to treat any religious group preferentially than any other religious group in TDCJ.  In **Exhibit B,** attached to the Motion to Terminate Consent Decree, Marvin Dunbar, Manager III in TDCJ's Rehabilitation Programs Division, states that there are five Muslim Chaplains on staff with TDCJ for the 6,899 offenders who designated their faith preference as Muslim (as of June 30, 2012).  As of July 19, 2012, according to Mr. Dunbar, the number of hours of religious programming for Muslims depended on the number of Muslim offenders at a particular unit.  The majority of units received 6 hours of programming weekly (2 hours of Jumah, 2 hours of Taleem, and 2 hours of Quranic Studies).  Some units  provided only Jumah and another 2 hour service due to having fewer Muslim offenders.  If there were only one or two Muslim offenders at a unit, they were given a lay-in to observe 2 hours of Jumah individually in their cells.  Currently, after the implementation of the *Scott* Compliance Plan, Muslim inmates are receiving one (1) hour per week of religious services supervised by either a unit chaplain or security personnel, just like every other faith group in TDCJ.  *See,* attached **Exhibit M** (Oral Deposition of Billy Denton Pierce, p. 29, line 21 through p. 30, line 9) and **Exhibit N**  (third affidavit of Martin Dunbar).  If religious volunteers are present, additional hours of religious programming are available for all faith groups.

Mr. Dunbar further states in his affidavit that offenders are allowed by A.D.-070 to possess a personal Quran and to posses literature on their religion purchased from approved vendors or

donated by approved donors. He also states that per TDCJ Food Services Policy 03/01(rev. 3) Diets and A.D.-05.25 (rev. 3), offenders shall be allowed to select one (1) of three (3) menu plans: regular, pork-free, or meat free. Finally, Mr. Dunbar states in his affidavit that Chapters 5 and Chapter 6 of the Chaplaincy Manual set forth the religious items available to Muslim offenders (kufi cap, hijab, diker beads, medallion, prayer oil), while Chapter 5 sets out the Holy Days which they can observe (Ramadan, Id Ul Fitr, Id Ul Adha).

In **Exhibit C,** attached to the Motion to Terminate Consent Decree, Marjie Haynes, Director of Instructional Services for the Windham School District, states that WSD maintains libraries in each of the prison units of TDCJ for the benefit of incarcerated offenders, and that WSD maintains a Koran in each of the unit libraries.

Finally, attached to the Motion to Terminate Consent Decree, are the following applicable TDCJ policies:

**Exhibit D:**   TDCJ Chaplaincy Manual 6.01 (rev. 1), dated June 2009, Islam: General Information;

**Exhibit E**:   TDCJ Chaplaincy Manual 5.01 (rev. 1), dated July 2012, Religious Devotional Items and Observed Holy Days, with att. A and B;

**Exhibit F**:   TDCJ Administrative Directive AD-05.25 (rev. 3), dated October 11, 2002, Menus and Diets;

**Exhibit G:**   TDCJ Chaplaincy Manual 3.01 (rev. 3), dated February 2008, Diet Plans;

**Exhibit H:**   TDCJ Chaplaincy Manual 3.02 (rev. 2), dated February 2008, Food Donations; and,

**Exhibit I**:   TDCJ Administrative Directive AD-07.30 (rev. 6), dated May 8, 2006, Procedures for Religious Programming.

## IV.   ARGUMENT

### (A)  Mandatory Intervention

Movants, on behalf of eight dissenting class members, essentially ask for mandatory intervention and appointment of themselves as counsel. The four requirements of mandatory intervention that a party must satisfy under Federal Rule 24(a)(2) are well established: "(1) [t]he application must be timely; (2) the applicant must have an interest relating to the property or transaction that is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede its ability to protect its interest; and (4) the applicant's interest must be inadequately represented by the existing parties to the suit." *League of United Latin American Citizens, Dist. 19 v. City of Boerne,* 659 F.3d 421, 433 (5th Cir. 2011), quoting, *Sierra Club v. Espy,* 18 F.3d 1201, 1204-05 (5th Cir. 1994). "If a party seeking to intervene fails to meet any one of those requirements, it cannot intervene as a matter of right." *Sierra Club,* 18 F.3d at 1205.

Movants have failed to establish the second, third, and fourth requirements. As to the second element, Movants "must have an interest relating to the property or transaction that is the subject of the action." As established by the Fifth Circuit, for a movant to meet this element, "what is required is that the interest be one which the substantive law recognizes as belonging to or being owned by the applicant." *New Orleans Public Service, Inc. v. United Gas Pipe Line Co.,* 732 F.2d 452, 464 (5th Cir. 1984)(en banc). Movants have failed to make this showing. They argued in their motion that, "as practicing Muslims in TDCJ . . . [they] have a clear interest in upholding the *Brown v. Beto* Consent Decree" and "Upholding less than the full Consent Decree would impair their interest." (p. 3 of Motion). However, Movants have only made bald assertions. They supported their motion with no evidence. Movants have alleged no facts and presented no evidence showing

that any of the 22 provisions of the Consent Decree is necessary or that they are being harmed by the current status quo of what TDCJ's policies provide. As shown above, since entry of the consent decree and except for the supervision component and the change to the number of hours of religious services per week for Muslim inmates required by *Scott v. Pierce,* the TDCJ has continually complied with its requirements. See **Exhibit B and Exhibit C** (attached to Motion to Terminate Consent Decree, Affidavits of Marvin Dunbar and Marjie Haynes respectively). *See also,* Order, Doc. No. 109 (Jan. 7, 1999)(striking down a motion to intervene and enforce the consent decree because, in part, the Court concluded that state officials "have complied with the Decree."). Further, as shown above, the advances in TDCJ's religious policies since the filing of the Consent Decree make the decree unnecessary. Moreover, as established by the Motion to Terminate Consent Decree (D. E. 130), under the Prison Litigation Reform Act (PLRA), 18 U.S.C. § 3626, the Defendants' successors in office are entitled to an immediate termination of the consent decree in this case.

As to the third element, Movants have failed to allege any facts or provide any evidence showing that they are "so situated that the disposition of the action may, as a practical matter, impair or impede [their] ability to protect [their] interest." As stated, the above evidence shows that since entry of the consent decree and except for the change to the supervision component and the number of hours of religious services per week for Muslim inmates required by *Scott v. Pierce,* the TDCJ has continually complied with its requirements, and the advances in TDCJ's religious policies make the decree unnecessary. Further, since the class representative, Bobby Brown, is challenging Sections 8 and 15 of the Consent Decree, regarding supervision of religious activities and the number of hours per week of religious services for Muslim inmates, the Texas Civil Rights Project and the eight dissenting class inmates do not need to intervene for those issues.

Finally, as to the fourth element, Movants have presented no evidence demonstrating that their interests have been inadequately represented by the class representative Bobby R. Brown. Movants argue that "the current class representative's offer to concede to the termination of all but one provision of the Consent Decree inadequately represents their interests." (p. 3 of Motion). Movants, though, allege no facts or present no evidence to show that any of the 22 provisions of the Consent Decree is necessary. The Defendants' above evidence establishes that by the TDCJ policies and procedures, the religious needs of the Muslim inmates are being met.

Movants' other arguments for mandatory intervention are without merit. Movants argue that "Defendants have a far greater evidentiary burden under RLUIPA's provisions than they did under the First Amendment." (p. 2 of Motion). However, as shown by the Consent Decree and the record in this case, there are no RLUIPA claims; the claims are only asserted under the First Amendment. Next, Movants argue that "class members have not been put on any class-wide notice of the motion to terminate." (p. 4 of motion). This statement is incorrect. Class members were put on class-wide notice of the motion to terminate. As shown by the attached **Exhibit J,** which is the second affidavit of Marvin Dunbar, the area Muslim chaplains conducted meetings in their assigned areas at all prison units with Muslim services to notify Muslim offenders of the change in religious programming that would occur due to the motion to terminate. Evidence of these meetings are also established by the attached **Exhibit K,** which are the affidavits of the TDCJ Muslim Chaplains, Akbar Shabazz, Hasan Rasheed, Haywood Talib, Omar Shakir, and Clarence Madyun. Further, notice of the motion to terminate was printed in the TDCJ prison newspaper, "The Echo," in its December 2012/January 2013 and March 2013 issues. *See*, the attached **Exhibit L.**[4]

---

[4] The newspaper is distributed free to the inmates of TDCJ.

**(B) Permissive Intervention**

Movants are also not entitled to permissive intervention under Federal Rule 24(b)(1)(B). Movants remain members of the class and their intervention would not aid the class in correcting any constitutional violations. As stated, Movants failed to submit any evidence with their motion and the Defendants' above evidence establishes that by the TDCJ policies and procedure, the religious needs of the Muslim inmates are being met.

**(C)  Counsel are Not Entitled to Be Appointed.**

Counsel for Movants have also failed to show that they are entitled to be appointed to represent eight class members. "A federal district court has discretion to appoint counsel if doing so would advance the proper administration of justice." *Ulmer v. Chancellor,* 691 F.2d 209, 213 (5th Cir. 1982). As stated and as shown above, the religious needs of the Muslim inmates are being met and the advances in TDCJ's religious policies make the decree unnecessary.

ACCORDINGLY, the Successor Defendants respectfully pray that the Texas Civil Rights Project's "Motion to be Appointed as Counsel for Dissenting Class Members" be denied.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DAVID C. MATTAX
Deputy Attorney General for Defense Litigation

KAREN D. MATLOCK
Assistant Attorney General
Chief, Law Enforcement Defense Division

/s/ Celamaine Cunniff
CELAMAINE CUNNIFF
Assistant Attorney General
Attorney-In-Charge
State Bar No. 05231500
So. Id. No. 30920
cela.cunniff@texasattorneygeneral.gov

BRUCE R. GARCIA
Assistant Attorney General
State Bar No. 07631060
So. Id. No. 18934
bruce.garcia@texasattorneygeneral.gov

P.O. Box 12548, Capitol Station
Austin, Texas  78711
Phone (512) 463-2080
Fax No. (512) 495-9139

**ATTORNEYS FOR TDCJ SUCCESSOR DEFENDANTS**

**NOTICE OF ELECTRONIC FILING**

I, CELAMAINE CUNNIFF, Assistant Attorney General of Texas, do hereby certify that I have electronically submitted for filing a true and correct copy of the above and forgoing **Successor Defendants' Response in Opposition to Texas Civil Rights Project's "Motion to Be Appointed As Counsel for Dissenting Class Members"** in accordance with the Electronic Case Files system of the Southern District of Texas, on this 15th day of May, 2013.

/s/ Celamaine Cunniff
CELAMAINE CUNNIFF
Assistant Attorney General

# CERTIFICATE OF SERVICE

I, **CELAMAINE CUNNIFF**, Assistant Attorney General of Texas, certify that a true and correct copy of **Successor Defendants' Response in Opposition to Texas Civil Rights Project's "Motion to Be Appointed as Counsel for Dissenting Class Members"** has been served by electronic means to the following counsel on this 15th day of May, 2013:

Mr. Gerald N. Birnberg
Williams, Birnberg & Anderson, LLP
2000 Bering Drive, Ste. 909
Houston, TX 77057-3732
*Counsel for Plaintiffs' Class*

Mr. Edward A. Mallett
Mallett Saper Berg, LLP
600 Travis St., Ste. 1900
Houston, TX 77002-2911
*Counsel for Plaintiffs' Class*

Mr. Scott Medlock
Mr. Brian McGiverin
Mr. James C. Harrington
Texas Civil Rights Project
1405 Montopolis Drive
Austin, TX. 78741-3438
Mr. Amin Alehashem
Texas Civil Rights Project-Houston
2500 T.C. Jester Blvd., Ste. 285
Houston, TX. 77008

    /s/ Celamaine Cunniff
CELAMAINE CUNNIFF
Assistant Attorney General