UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BOBBY R BROWN, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| vs. | § | CIVIL ACTION NO. 4:69-cv-00074 |
| | § | |
| BRAD LIVINGSTON, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OF FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

## I.      INTRODUCTION

Before the Court are the plaintiffs', Bobby R. Brown, individually and on behalf of others similarly situated, and the defendant's, Brad Livingston, in his official capacity as Executive Director of the Texas Department of Criminal Justice ("TDCJ"), proposed findings of facts and conclusions of law.  (Dkt. Nos. 356 & 357)  After a careful review of the parties' various submissions and the record of the evidentiary proceedings previously held before this Court, the Court sets forth its findings of fact and conclusions of law in this Memorandum.

## II.     SUMMARY OF FINDINGS AND CONCLUSIONS

In light of the complexity of the issues addressed in this Memorandum of Findings of Fact and Conclusions of Law, the Court presents a summary of its ultimate findings of fact and conclusions of law.  The Court finds that:  (a) TDCJ's current Administrative Directive 7.30 ("AD 7.30"), which embodies TDCJ's policy that inmates may not gather in groups of more than four for religious services unless a TDCJ staff member or outside volunteer is available to provide "direct supervision," is an ongoing violation of the Muslim inmates' federal rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and the First

Amendment; (b) the "Scott Plan," which is TDCJ's policy of providing TDCJ staff to supervise only one hour of religious services per week for each faith group unless an outside volunteer is present to provide direct supervision, is an ongoing violation of the Muslim inmates' federal rights under RLUIPA and the First Amendment; and (c) exempting inmates, whether adherents to a religious sect or group or not, from the strictures and restrictions of the Scott Plan[1] and AD 7.30[2] constitutes "content" discrimination in violation of the First Amendment to the Federal Constitution.

The Court concludes that the Scott Plan and AD 7.30 do not relate to a legitimate penological interest. *See Turner v. Safley*, 482 U.S. 78, 89 (1987) ("When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."). As applied, these policies violate the Muslim inmates' federal rights (under the Establishment Clause of the First Amendment to the U.S. Constitution, the Free Exercise Clause of the First Amendment and RLUIPA) and further restricts adherents who engage in religious activities in ways that the general population of inmates are not restricted when they engage in secular activities. Therefore, the Court concludes that sections II, III(8) and III(15) of the Consent Decree shall remain in full force and effect.

## III.   FACTUAL BACKGROUND

### A.   *The Consent Decree Report*

On July 20, 1977, this Court entered a Consent Decree that prohibited the Texas Department of Corrections, now, the Texas Department of Criminal Justice ("TDCJ"), from

---

[1] The "Scott Plan" arises as a result of *Scott v. Pierce*, No. H-09-3991 (S.D. Tex., May 7, 2012). TDCJ officials grouped the 236 declared faith preferences into 10 religious groups and stated that it would ensure all offenders an equal opportunity to attend worship services "one service each month under the direct supervision of a chaplain or volunteer." *Id.*
[2] AD 07.30 refers to TDCJ "Procedures for Religious Programming." It provides that additional time for communal religious activities may be provided where outside volunteers are available to supervise the service.

"discriminat[ing] against adherents to the Religion of Islam in the pursuit of their right to profess their religious beliefs and to exercise their religious practices."  The Consent Decree mandated that the "[d]efendants shall treat adherents to the Religion of Islam equally and on the same basis as, and to permit Islamic religious practices under substantially the same conditions as, are afforded to and enjoyed by adherents to Catholic, Protestant and Jewish faiths incarcerated within the Texas Department of Justice."  *See* Consent Decree, Section II, page 2.  To accomplish that objective, the Consent Decree contained some twenty-two specific provisions designed to ensure Muslim inmates equal opportunity to participate in religious activities as other religious groups.

The Consent Decree worked reasonably well to achieve its objectives, and TDCJ has done a number of things to enhance the opportunity for Muslim inmates to pursue their religious convictions.  For instance, prison libraries now have copies of the Holy Qur'an, TDCJ has hired five Muslim chaplains, TDCJ provides pork-free diets for Muslim inmates, and Muslim inmates can acquire and possess Islamic literature and memorabilia, subject to established prison rules and procedures.

As a consequence, there is no longer a need to continue twenty of the twenty-two specific provisions of Section III of the Consent Decree, and the plaintiffs do not oppose termination of those twenty provisions.  Two of those provisions, however—namely, Sections III(8) and III(15) along with Section II, which generally prohibits Muslim inmates from being discriminated against or treated differently from Catholic, Protestant and Jewish inmates, are still necessary to correct current and ongoing violations of the federal Constitutional and statutory rights of Muslim inmates.

Section III(15) of the Consent Decree requires TDCJ officials to "allow adherents to the Religion of Islam at each unit of the Texas Department of Corrections equal time for worship services and other religious activities each week as is enjoyed by adherents to the Catholic, Protestant and Jewish faiths."   Section III(8) requires that:

> whenever an ordained Islamic minister is unavailable at a particular time regularly scheduled for Islamic worship and study, (as set forth in item No.1 above and No. 15 hereafter), [TDCJ officials must] allow inmates professing adherence to the Religion of Islam to congregate under appropriate supervision for the purposes of worship, study in the Islamic faith, Sunday School and other religious functions and activities as set forth hereinabove and hereinafter, with a leader designated from their midst; provided, however, that such inmate leader shall have previously secured the approval of an appropriate official of the Texas Department of Corrections, and provided further, however, that the Texas Department of Corrections shall not unreasonably withhold or delay such approval.

The resulting governance, hereinafter referred to as "*Brown v. Beto*" or "the *Brown v. Beto* regime," was in effect from July 20, 1977, until TDCJ officials unilaterally discontinued following the mandates by implementing the "Scott Plan" effective January 1, 2013.   Under *Brown v. Beto*, whenever a Muslim Chaplain was available at a time regularly scheduled for Jum'ah, Taleem, or Qur'anic studies, those activities were conducted with a Chaplain.  However, if a Muslim Chaplain was unavailable, those activities were still conducted, generally under "indirect" prison supervision.   Hence, supervision was provided by a prison official in the vicinity, checking in from time to time while engaged in other religious and/or secular activities, through windows or by other means such as video cameras and audio recordings.  Generally, a prison official was not physically present inside the room where the religious activity was taking place at all times.

During the thirty-five years the Consent Decree was in effect and being adhered to by TDCJ, there has been no evidence of a single reported or known incident involving a serious security risk to the prison, its staff, inmates or the public at large involving an inmate-led Muslim religious activity.  In other words, adherence to Sections III(8) and III(15) of the Consent Decree has not presented or posed a threat to the security or safety of the institution or the public.  Nor has a single reported incident, episode, or event resulted in any disciplinary action or injury of any sort to any person or property.

In fact, throughout the thirty-five year history of the Consent Decree, very few minor disturbances have occurred during Muslim religious activities—all of which were dealt with by prison officials and none of which posed a threat to the security or safety of the institution or was sufficiently serious to warrant recordation as a disciplinary infraction.  *See, e.g., Watson v. Wakefield,* No. H-08-0903, 2009 WL 3151320 (S.D. Tex. Sept. 25, 2009); *Lemons v. Tex. Dept. of Crim. Justice,* No. 2:09-CV-0102, 2012 WL 2133700 (*N.D. Tex., May 17, 2012).  Services of other religions, where an outside volunteer or TDCJ staff member was present, reported experiencing similar minor incidents.  *See, e.g., Freeman v. Tex.Dept. of Crim. Justice*, 369 F.3d 854 (5th Cir. 2004) (Church of Christ service).

On the other hand, there is evidence that the more serious incidents that occurred at or near religious activities occurred during Catholic and Protestant services even though a Chaplain, prison guard, or outside volunteer was present.  As a result of the Consent Decree, from July, 1977 until January 1, 2013, Muslim, Jewish, Catholic, Protestant, and Native American inmates have all enjoyed an average of six hours of religious activities each week at each TDCJ unit where inmates of those faith groups were housed.

The frequency of these religious activities began to change on or around September 1, 2012. On August 1, 2012, TDCJ filed a motion to vacate the Consent Decree. Thereafter, by operation of 18 U.S.C. § 3626(e)(2)(a), the provisions of the Consent Decree were automatically stayed. Right away, TDCJ ceased complying with Sections II, III(8) and III(15) of the Consent Decree. As a result, Muslim inmates who previously had access to approximately six hours per week of religious activities found that their religious activities were reduced to one hour per week under the guise of equalization based on the availability of prison officials, Muslim Chaplains or volunteers. However, Catholic, Protestant, Jewish and Native American inmates continued to receive the same number of hours of access to religious programs that they enjoyed before the change because of specific arrangements made by TDCJ and/or because of the availability of volunteers and religious leaders.

### B.       Unit Assignments Impact Religious Services[3]

As of May 31, 2013, there were approximately 151,139 inmates incarcerated in the TDCJ. As far as unit locations are concerned, inmates are housed in 111 prison units located in 61 Texas counties. Each inmate is allowed to choose or designate a faith preference and approximately 139,722 members of the current inmate population have done so. For administrative purposes, TDCJ classifies religious preferences under ten "faith groups." As of May 31, 2013, approximately 6,775 inmates have expressed a religious preference for the Muslim group. As of February 28, 2013, approximately 31,432 inmates expressed a preference for the Catholic faith group. Approximately 88,504 inmates expressed a preference for the Protestant faith group. There are approximately 4,418 inmates that have expressed a preference for the Native American faith group. Approximately 896 inmates have expressed a religious

---

[3] *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law, Dkt No. 356 at 5- 6, for statistics referenced in this section; *see also* "Parties Joint Exhibit List", [Dkt. No. 379].

preference for the Jewish faith group.  And, approximately 1,740 inmates have designated a religious preference for the Jehovah's Witness faith group.  The remaining faith groups currently have less than 900 adherents total and no unit has more than fifteen adherents.

### C.      Allocation of Chaplains Impact Religious Services[4]

The TDCJ currently employs 121 Chaplains.  Approximately 102 or 84% of them claim Christianity as their faith preference.  However, the Protestant inmate population represents 65% of the declared religious inmate population.  They are assigned to individual prison units or, in the case of six of them, to two prison units.  There is one full-time and three contract Native American Chaplains, one contract Jewish Chaplains, and six small faith group regional Chaplains. There are also Protestant regional Chaplains or Chaplaincy Administrators.  The five Muslim Chaplain employed by TDCJ are assigned to an average of twenty units each.  For instance, Chaplain Shabazz, a Muslim Chaplain, is assigned to 30 prison units.

As of May 1, 2013, there were approximately 18,051 active religious volunteers approved by TDCJ.  Of those, more than 14,500 are Protestant, 477 are Jehovah's Witnesses, 1,535 are of unknown religious affiliation, 302 have designated no religious affiliation, and 213 are Muslims.  Since May 1, 2013, an additional 86 Muslim volunteers have become approved. In addition, there are 385 certified volunteer chaplain assistants, of which 333 are Protestant. The religious preferences of the remaining volunteers are unknown, but none are Muslim.

### D.      Outside Volunteers[5]

The reasons for the disparity in access to religious activities are mainly a result of:  (1) the lack of availability of a full-time Muslim Chaplain assigned to each prison unit; and (2) the assignment of Muslim inmates, primarily to housing units that are long distances from

---

[4] *See* n.3, *infra*.
[5] *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law, Dkt. No. 356 at 10-14, (Dkt No. 356) for statistics referenced in this section. *See also* Dkt. No. 379.

population centers where a significant numbers of Muslim civilians reside.  Whether it is the intent of the TDCJ to assign Muslim inmates to areas in the state where Muslim volunteers do not reside that, nevertheless, is the effect of unit assignments.  A large number of Muslim inmates are assigned to units that are located predominately in remote areas of the state where few Muslim civilians reside.

The TDCJ's AD 7.30[6] permits additional time for communal religious activities if outside volunteers were available to "supervise" those services.  Yet, despite specific and concerted efforts over the past years to recruit volunteers to participate in Muslim religious activities at the prison, TDCJ has been unsuccessful in securing a significant number of Muslim religious volunteers.  The evidence establishes that there is no reasonable possibility that a sufficient number of Muslim volunteers will ever be obtained based on where Muslim volunteers live, how Muslim inmates are assigned to units and the fact that the faith mandates Friday mid-day service for all Muslims.  Therefore, application of the "Scott Plan" to Muslim inmates denies them a full opportunity to practice their faith.  Muslim inmates do not, in fact, have an equal opportunity to engage in religious activities mandated by their faith.  Moreover, and more importantly, they are denied a sufficient number of hours to satisfy the minimum mandatory requirements of their religion.

By contrast, there are adequate volunteers to provide an average of six hours of religious programs for Catholic and Protestant inmates at all units throughout TDCJ.  In fact, there are more than 18,000 Protestant religious volunteers at the present time and fewer than 400 Muslim volunteers.  Muslim inmates are housed in 96 of the 111 TDCJ units throughout the state of Texas. The evidence in this case demonstrates that many of the units are located in counties

---

[6] Administrative Directive 07.30 "Procedures for Religious Programming" was last approved/modified on May 8, 2006.  For relevant content, *see* (Dkt. Nos. 379, Exh. No. 1).

where few Muslims reside or live in adjacent counties.  For example, there are five prison units in Anderson County, housing 839 Muslim inmates, but only 365 Muslim citizens reside in the County.  By contrast, there are nearly 29,000 Protestants in that same County from whom Protestant religious volunteers may be recruited.  Similarly, Bee County has three prison units housing 289 Muslim inmates, but only 387 Muslim citizens reside in the community.  Brazoria County has six prison units, housing 417 Muslims, but only 5,084 Muslim citizens reside in the county.

On the other hand, there are 168,000 Protestant citizens in Brazoria County from which volunteers may be recruited.  Coryell County has six prison units, but only 1,574 Muslim citizens reside there and are potentially available to serve 453 Muslim inmates.  Dawson County has six Muslim citizens but houses 98 Muslim inmates in two prison units.  There are three Muslim citizens in Falls County, where two prison units house 73 Muslim inmates.  Freestone County has one Muslim citizen, yet there are 50 Muslim inmates housed in the County.  There are no Muslim citizens in Frio County, 298 in Grimes County, 145 in Houston County and three in Jones County, where two prison units house 226 Muslim inmates.  One Muslim citizen resides in Karnes County, yet there are 194 Muslim inmates housed in the County.  There are 283 Muslim citizens in Madison County and none in Mitchell County, where two prison units house Muslim inmates.  There are 126 Muslim citizens in Pecos County and 100 Muslim citizens in Wichita County, where 379 Muslim inmates are housed.  In Walker County, where seven prison units are located, 697 Muslim inmates are housed.  Yet, only 827 Muslim citizens reside in the area.

Even when populations in surrounding or adjacent counties are taken into consideration, the results are the same.  Anderson and the counties that surround it have nine prison units that house 1,149 Muslim inmates.  Combined, however, there are only 1,530 Muslim citizens in those

Counties.  By contrast, there are 275,000 Protestant residents in those Counties from where Christian volunteers may be recruited.  Similarly, Angelina and surrounding Counties contain eight prison units housing 702 Muslim inmates; yet, there are only 5,006 Muslim citizens.  Bee and surrounding Counties have four prison units with 483 Muslim inmates and only 1,598 Muslim citizens reside in the six-county area.  Cherokee and surrounding Counties house 1,185 Muslim inmates in 13 prison units.  Only 5,809 Muslim citizens reside in the area compared to 336,000 Protestants.  Taking into account its four surrounding counties, Childress County has five Muslim residents and 53 Muslim prisoners.  Freestone and surrounding Counties have six prison units, where 889 Muslim inmates are housed, but only 1,230 Muslim citizens reside in the entire area.

Houston County, and the seven adjacent Counties, house 2,029 Muslim inmates in 18 units.  Nonetheless, the area has only 3,427 Muslim citizens residing there compared to 180,000 Protestants.  Karnes and surrounding Counties have 1,854 Muslim citizens and five prisons that house 223 Muslim inmates.  Madison and surrounding counties have 12 units, 1,208 Muslim inmates, 4,302 Muslim citizens, and 154,000 Protestants.  Polk and surrounding Counties have eight units, 499 Muslim inmates and 163,000 Protestant residents.  Still, 6,351 Muslim citizens live in the area.

Therefore, it follows:  (a) that it is much easier for TDCJ to recruit Protestant volunteers to attend religious activities in its prison units than it is for TDCJ to obtain Muslim volunteers to attend Muslim religious activities; and (b) there is no evidence that Protestant volunteers are volunteering to serve in any capacity at a Muslim religious service.  Thus, when religious services are based on the availability of volunteers it means that Muslim inmates will not have access to Muslim religious services.

The placement of prison units and the assignment of Muslim inmates suggest that Protestant inmates are treated more favorably than Muslim inmates with regard to accessibility to religious activities.  The TDCJ is well aware of these statistics and the impossibility of recruiting a meaningful number of outside volunteers to participate in Muslim religious services.  Hence, TDCJ's volunteer policy places a substantial burden on Muslim inmates' ability to practice their religion.  Finally, the evidence shows that all Muslims, whether inmates or citizens, recognize that Jum'ah services must be conducted on Fridays shortly after the noon hour.  Adherence to the tenets of the Muslim faith means that Muslim volunteers must forego routine observance in order to volunteer.

### E.      The Religion of Islam – Its Practices

The practices of Jum'ah, Taleem, and Qur'anic studies are indispensable to a Muslim's exercise of his religious beliefs.  Jum'ah is a mandatory congregational prayer service roughly equivalent to a Catholic mass or a Protestant religious service.  It is the most sacred event in the Religion of Islam and attendance is obligatory.  According to the Qur'an, the holy book for Muslims, Jum'ah must occur on Fridays just after noon and consists of specific prayers recited in Arabic, followed by a sermon called the Khutbha.  Jum'ah must be conducted in congregation with other Muslims, as prescribed and required by the Qur'an. Therefore, individual prayer does not meet the requirements of the Qur'an for a Jum'ah service.

Taleem is religious instruction, similar in some respects to Sunday School for the Protestant faith, that is essentially or effectively obligatory for Muslims.  This is the service where Muslims, and individuals interested in converting to Islam, are taught the tenets of the religion, such as the Five Pillars of Islam, its practices, traditions, history, prayers and other matters necessary to fully participate in a Jum'ah service.  It is critical for obtaining an

understanding of the Religion of Islam and how to practice it.  Taleem is particularly crucial for new converts.  It, therefore, is of special importance to the practice of Islam in prison because most Muslim inmates convert to Islam after being incarcerated.  Taleem is the means by which they learn about the religion and how to properly practice it.  It is accomplished through formal group study, not individual study, and requires a teacher who has knowledge of Islam.

Taleem is also indispensable to an intelligent participation in Jum'ah.  In fact, under TDCJ's Chaplaincy Manual policy 6.02[7], an inmate must complete Shahada training, a part of Taleem, before he is permitted to attend Jum'ah services.  *See Denson v. Shabazz,* 44 F. App'x. 652 (5th Cir. 2002).

Qur'anic studies, learning and understanding the verses of the Qur'an, is mandatory for Muslims because the practice of the Religion of Islam requires an understanding of passages from the Qur'an.  Muslims believe that the Qur'an is the word of God, as revealed to Prophet Muhammad, and an understanding of the Qur'an is absolutely necessary to properly practice the Religion.  Further, the Arabic language is taught during Qur'anic studies.  The Qur'an requires that certain prayers be recited in Arabic, particularly at the Jum'ah service.  A knowledge of the Arabic language is, therefore, a fundamental part of the practice of Islam.  Finally, Qur'anic Studies is necessary because it is the method by which a practicing Muslim properly develops his faith. Learning about the Qur'an and memorizing certain passages is an implicit requirement of the Islamic faith.

The undisputed testimony in this case establishes that Muslim inmates hold sincere religious beliefs.  Many of the Muslim inmates who testified in this case have been practicing Islam for more than 10 years.  Each testified that the practice of Islam has been important to them and has made a difference in their lives.  Moreover, the record demonstrates that the

---

[7] *See* "Plaintiffs' Class Members Updated Exhibit List"; (Dkt. No. 380, Ex. No. 64].

practice of Islam is important to Muslim inmates generally and that it is impossible to conduct the three religious activities within the one hour per week time allocation.

### F.   *Religious Activities Within The TDCJ Under The Scott Plan*

Since TDCJ implemented the "Scott Plan", Muslim inmates have not had access to Taleem or Qur'anic Studies, except when they are housed in units that are the home station of one of the five Muslim Chaplains.  Even in those instances, access to all necessary religious programs is not guaranteed.  Only a few Muslim inmates have had visits from outside volunteers on a consistent basis.  Since the adoption of the "Scott Plan", the time for Jum'ah services has been reduced to one hour.  The Court finds that one hour of communal worship per week is insufficient even for a Jum'ah service.  Moreover, the fact that a service is scheduled for one hour does not automatically mean a full hour of worship occurs.  Often, a large portion of the time scheduled for a service is taken up with the movement of inmates, TDCJ's scheduled inmate counts, and other TDCJ administrative tasks.  Because many Muslim inmates, including the witnesses in this case, had regularly attended Taleem, Jum'ah, and Qur'anic Studies when they were offered, restricting their access to these activities significantly burdens them in the practice of their religion.

### G.   *Benefits of Religious Services*

The undisputed testimony in this case is that, overall, the regular practice of religion improves prison safety.  One plaintiff testified that, as a result of his practice of Islam, he believes that he will be held morally accountable for his actions, and that Islam is a religion of peace.  Another testified that Islam is the only thing that could discipline him and that it made him a peaceful person.  Other plaintiffs also testified that the practice of Islam has made them

more disciplined inmates.  Several of TDCJ's witnesses, including Chaplains, testified that they, too, believe that participation in religious activities reduces recidivism.

Studies of inmate participation in religious activities indicate that there is a substantial and direct correlation between attendance at religious activities and reduced prison disciplinary reports, especially among inmates attending at least ten religious activities per month.  In other words, the more prisoners participate in religious activities, the safer the prison unit.  In fact, TDCJ officials testified that participation in religious activities has a calming, positive, and rehabilitative effect on prisoners.

Studies further indicate that increased participation in religious activities increases the prospect that inmates will not violate conditions of parole resulting in revocations and recommitments.  In other words, the evidence is that the community is safer as a result of inmates attending religious activities while incarcerated.  The Director of Chaplaincy Services at TDCJ, Chaplain Billy Pierce, expressed the opinion that participation in religious activities is "beneficial for the rehabilitation of inmates," because "if you change a man's heart, you change his actions."  Accordingly, he states, the more access inmates have to religious activities, the "safer" society is.

### H.     Muslim Inmate-led Religious Services Pose No Security Risk

There is no evidence that Muslim religious services, as they were supervised under the Consent Decree, presented safety concerns to the prison.  One inmate testified that Muslim inmates do not approve of disruptions in their services. As well, other inmates testified that in the many years that they had attended Muslim religious services, they had never witnessed a fight or a security or discipline problem beyond loud talking.  Chaplains Akbar Shabazz and Pierce, likewise, testified that they were not aware of any serious security incidents.  Chaplain Pierce

further testified that he believes that the Muslim services, as conducted under the Consent Decree, were conducted "consistent with the safety and security concerns of the unit."

Pursuant to TDCJ's rules, a written disciplinary report, however minor, must be prepared and filed whenever there is an incident or event that creates a risk to the security of the institution.  There are no written disciplinary reports of incidents involving indirectly supervised or inmate-led Muslim religious services.   Neither the Director of Chaplaincy nor Muslim Chaplains who testified in this case had any knowledge, or ever heard, of any incident, event or episode involving a security or safety threat of any kind at any time during the thirty-five years the Consent Decree remained in effect.

### I.      Volunteers Are Not Security Personnel

There is some evidence that disruptions have occurred in non-Muslim religious services even when a volunteer or TDCJ Chaplain was present.  This fact demonstrates that a certain level of disruption may occur regardless of whether supervision is direct or indirect.  Otherwise, there is no evidence that the presence of an outside volunteer contributes to security.  In fact, Chaplain Pierce testified that the purpose of outside volunteers is to improve the quality of the services, not provide security.  Therefore, TDCJ administrator's contention that the presence of an outside volunteer furthers its compelling state interest in prison security is unfounded and contradicted by the evidence.

The plaintiffs presented expert witness Ron McAndrew[8], a former prison warden in the Florida prison system, who also has had experience with the Texas prison system.  The Court finds that McAndrew has significant experience in managing security in large prison systems similar to the Texas prison system and that he has sufficient experience with the Texas prison system to be able to compare his experiences in Florida to the Texas system.  McAndrew

---

[8] *See* n.6 [Exh. No. 66 and 72].

testified that prisons use methods other than direct supervision to ensure security at religious meetings, such as roving patrols and visual observations through windows.  He also testified that, in his experience, the practice of permitting inmate-led services, as described in the Consent Decree, was the "usual" practice in prison systems.

Witness Ibrahim Ezghair, a former Chaplain in the New York State Department of Corrections and Community Supervision, a prison system comprised of 50 units and more than 55,000 inmates, testified that the New York State prison system adopted the *Brown v. Beto* regime after the Consent Decree went into effect.  He further reasoned that since its implementation, it has experienced no security or safety threats or events involving inmate-led or indirectly supervised Muslim religious activities.  Chaplain Shabazz testified that many prison systems throughout the United States have adopted the *Brown v. Beto* regime, employing indirect supervision of inmate-led religious activities thereby permitting Muslim inmates full participation in religious activities.  He was unaware of any safety concerns that had ever been expressed or experienced under this regime.

Prior to the entry of the *Scott* decree, there was no suggestion by anyone in TDCJ that the *Brown v. Beto* regime needed to be changed or abandoned on account of security or any other concerns, despite regular review by prison security officials and experts and lawyers in connection with revisions to prison Administrative Directives and Chaplaincy Manual Policies. In fact, TDCJ's *own* witnesses testified that TDCJ's decision to abandon *Brown* v. *Beto* and its methodology was not the product of any safety or security problems or concerns relating to Muslim services, but solely the result of this Court's decision in *Scott v. Pierce,* No. H-09-3991 3991 (S.D. Tex. 2011).[9]  Prison officials contend that they interpreted *Scott v. Pierce* to mean

---

[9] In *Scott v. Pierce*, William Scott contended that as a Jehovah's Witness, his religious freedom was being infringed because they could not meet without a volunteer present, even though Muslims and Jews were permitted to meet

continuing the *Brown v. Beto* regime would violate the rights of non-Muslim inmates because non-Muslim religious services were being directly supervised.

### J.    Direct Supervision Constitutes Content Discrimination

TDCJ contends that a TDCJ staff member or a volunteer must be present during religious services to, among other things, prevent inmates from discussing unauthorized activities. However, TDCJ permits groups of four to eight inmates to gather to play dominoes in a day room and permits inmates to speak to each other even in foreign languages. TDCJ also permits inmates to lead Safe Prison Program classes without continuous supervision. It permits Protestant choir practice at the Robinson Unit to take place in a multi-purpose room, where an officer sits at a desk outside the room. Likewise, band practice has taken place at the Ellis Unit for many years under the leadership of an inmate coordinator. Staff observe band practice through small windows in the doors but are not required to be in the room with the inmates. Craft shops require minimum security even though a variety of tools, including saws and propane torches are handled by inmates. These gatherings take place in multipurpose rooms under indirect supervision. In fact, the officers who provide security for the craft shops also supervise other non-religious activities at the same time.

Similar indirect supervision is provided in certain dormitory facilities. In these instances, the unit has video surveillance and/or an officer patrolling the dormitory units on a continuous basis. The TDCJ has failed to explain why religious services present a safety issue while secular programs do not. To require direct supervision of inmates congregating to pray while showing less concern for secular activities constitutes a form of "content" discrimination that the First Amendment condemns and prohibits. *See Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95

---

without a volunteer being present. The Court enjoined TDCJ pursuant to findings that the Establishment Clause was being violated. The defendant was granted 60 days to propose a method of compliance.

(1972) ("But, above all else, the First Amendment  means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.").

It is, therefore, the conclusion of the Court that Sections III(8) and III(15) of the Consent Decree have no adverse impact on prison safety or the administration of criminal justice.  On the other hand, there are security concerns relating to increased reliance on and use of volunteers. TDCJ's Volunteer Services Handbook explicitly warns volunteers of the "inherent risks" of serving as a volunteer in prison and provides training on protocols to follow if exposed to inmate aggression.   Volunteers are also potential targets for hostage takings and the source of contraband smuggling, a threat that is sufficiently real that volunteers are searched on each occasion that they enter and exit a prison unit.

Finally, there is no evidence that indirect supervision of Muslim religious services leads to more disciplinary infractions or other security issues.  Nor is there any evidence that direct supervision of religious services reduces or eliminates disciplinary infractions.  Further, TDCJ's conjecture, that if Muslim inmates are permitted to conduct religious services under indirect supervision their lack of direct supervision during these services could cause tensions among Muslim inmates and inmates of other faiths, is groundless. If TDCJ truly believed this unsupported view, it is resolved by permitting all religious faiths to conduct religious services without direct supervision.  In any event, there is no evidence that any such tension occurred in the past 35 years, or that any security problems have arisen as a direct result of the Consent Decree.

### K.     *Minimizing Cost – A False Claim*

Terminating the Consent Decree in favor of AD 7.30 does not further any interest that TDCJ has in minimizing cost.  Under the Consent Decree, TDCJ was not required, and in most

cases, did not provide a staff member to be present continuously during Muslim religious services. However, applying AD 7.30 to Muslim religious services requires TDCJ to increase its staff simply to supervise Muslim religious services. This move necessarily increases cost. The TDCJ has failed to present any evidence that the costs of continuing the historical method of supervision of Muslim services was more expensive than the method it has implemented under its Scott Plan.

Nor is there evidence that TDCJ conducted a study or considered the comparative cost prior to implementing its Scott Plan. Hence, its calculations concerning the number of hours needed to provide direct supervision of Muslim and non-Muslim religious services is irrelevant. A proper measure of cost would compare the cost of supervision under the Consent Decree with that under the Scott Plan. Even the idea that more volunteers would reduce cost is a hoax. The policy of the Scott Plan, permitting an unlimited number of outside volunteers to supervise religious services where such volunteers are available, as a cost containment approach, is unsupported by the evidence. The undisputed evidence shows that the use of volunteers in TDCJ increases cost in terms of staff, time and resources -- costs, such as those necessary to recruit, perform background checks, train, escort, supervise, schedule, and keep records of volunteers, far exceed the costs associated with inmate-led religious activities. Thus, the Scott Plan does not advance any legitimate prison interest in controlling cost. On the contrary, it increases cost substantially.

### L.    *Inmate Assignment Policy Not Neutrally Applied*

The TDCJ's inmate assignment policy has not been neutrally applied. To the contrary, unlike Muslim inmates, Jewish inmates are specifically assigned to units in order that they are closer to prospective volunteers. The TDCJ has four units designated for Jewish inmates and

Jewish inmates are intentionally located in places where the largest number of Jews reside so as to enhance the opportunity for Jewish inmates to interact with Jewish citizens in religious activities.  Likewise, Native American inmates are assigned to a specifically designated unit to facilitate access to each other and to enhance Native American religious activities.  By contrast, there are no units designated as Muslim units in close proximity to Muslim citizen volunteers--- that consideration was not contemplated by TDCJ in assigning Muslim inmates to housing units.

The neutrality problem is exacerbated with regard to Muslim inmates because the most sacred event in Islam – Jum'ah - must occur shortly after midday on Fridays, a day when potential volunteers are at work and unable to travel to prison units to participate.  Protestant services are commonly held on weekends when many potential volunteers are available to travel to TDCJ's units.  Hence, TDCJ's policy, or lack thereof, on Muslim housing assignments and Islam's mandatory Friday services effectively precludes volunteer-led Muslim religious activities on Islam's holiest day.  The TDCJ knowingly adopted a policy it knew would impose requirements on Muslim inmates' religious services that could not be satisfied by volunteers or overcome by Muslim inmates.

Its direct supervision policy also promotes Protestantism over Islam in other more subtle ways.  Taleem is the activity during which non-Muslims can learn about the Religion of Islam, but Taleem has been effectively eliminated by the termination of the *Brown v. Beto* regime.  Hence, non-Muslims are, in fact, prohibited from attending Jum'ah.  On the other hand, TDCJ permits and facilitates many hours of Protestant programming to all inmates.  Such programming allows inmates to learn about Christianity even if they are not practicing Protestants.  Permitting and facilitating these teaching programs for all inmates while denying similar programs to Muslims directly establishes and promotes Protestantism as TDCJ's religion.  Hence, TDCJ has

effectively established a religion – an act that violates the "Establishment Clause" to the federal Constitution.   This failing is aided by the fact that the majority of the Chaplaincy staff is Protestant and is insensitive to or incapable of fulfilling their duty to Muslim inmates.

## IV.    CONCLUSIONS OF LAW

The Prison Litigation Reform Act, 18 U.S.C. § 3626 ("PLRA"), and specifically, section 3626(b)(3), provides that a Consent Decree may not be terminated "if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right."   There are three distinct federal rights that are at issue in this case:  (a) the Establishment Clause; (b) the Free Exercise Clause; and (c) RLUIPA.   The Court will address each in turn.

### A.      *The Establishment Clause Violation*

The Court is of the opinion that there is a current and ongoing violation of the "Establishment Clause" of the First Amendment to the Constitution of the United States.   Under the Establishment Clause, Muslim inmates have the right to be free from differential treatment and policies with regard to access to religious activities and policies that favor inmates of other religions.   The core inquiry in this regard is whether similarly situated adherents of other faiths *i.e.,* Catholic, Protestant, Jewish and Native American, are afforded greater *or easier* access to religious activities than are Muslim inmates.   In this regard, the essence of the Establishment Clause is that "every denomination . . . be equally at liberty to exercise and propagate its beliefs."  *Larsen* v. *Valente*, 456 U.S. 228, 245 (1982).   A state cannot "pass laws [or enact regulations] that aid one religion" over another.   *Everson v. Board of Educ.*, 330 U.S. 1, 15 (1947).   Nor can it adopt policies that disproportionately disadvantage one religion or make it

more difficult for its adherents to practice their religion than otherwise similarly situated followers of other faiths. *Id.*

The fact that Jewish inmates are assigned to four particular units within the prison system *specifically* to bring them closer to Jewish religious volunteers and that Native American inmates are assigned to housing units *specifically* selected to make religions activities more available to them, while TDCJ makes no effort to house Muslim inmates in units close to the population centers where Muslim volunteers might be recruited, constitutes a clear violation of the Establishment Clause. Prison officials are deliberately favoring Jewish and Native American inmates over Muslim inmates by facilitating their access to religious activities. Thus, TDCJ has intentionally made it easier for Jewish inmates over Muslim inmates to have volunteer-led religious activities. That circumstance alone, in and of itself, constitutes a violation of the Establishment Clause. *See McAlister* v. *Livingston*, 348 F. App'x 923, 937 (5th Cir. 2009); *see also Mayfield v. Tex. Dept. of Crim. Justice*, 529 F.3d 599, 608 (5th Cir. 2008) (reversing summary judgment because issue of facts existed as to neutrality in the prison's application of religious volunteer policy).

The TDCJ acknowledges that Muslim inmates face a far greater burden getting outside volunteers than do inmates of other religious faith groups. *See Hyde v. Tex. Dep't of Crim. Justice*, 948 F. Supp. 625, 626 (S.D. Tex. 1996). Yet, it argues that a different rule should apply to groups other than Muslims because there is an ample supply of clerics and laymen who will volunteer to conduct meetings (for other groups)**,** but that among Muslims it has been hard to find a consistent supply of such volunteers. In such circumstances, a policy that makes the availability of religious activities dependent upon the availability of outside volunteers necessarily makes it easier for one group to practice its religion over other groups. Moreover,

the policy overlooks the fact that it is TDCJ's duty to insure that Muslim inmates are not disadvantaged.

Further, TDCJ openly favors the Protestantism and disfavors Islam by devoting state resources to the former disproportionately.  Specifically, TDCJ provides resources for volunteer-led services in the form of staff-provided security, screening, volunteer training, meeting space, record-keeping, and scheduling, and provides other expenditures that support primarily Protestant volunteers.  TDCJ has chosen to allocate substantially more resources to religious groups who can procure outside volunteers than for those who are unable to recruit sufficient numbers of outside volunteers to comply with AD 7.30.  The result of those expenditures is that Protestant inmates are able to engage in substantial religious activities, while Muslim inmates are denied basic and fundamental religious activities.

The Consent Decree "fixed" the Establishment Clause deficiencies by requiring that adherents to the Religion of Islam at each unit of the TDCJ be given equal time for worship services and other religious activities each week as is allocated to adherents to the Catholic, Protestant and Jewish faiths.  The equal time mandate was not and cannot, however, be based on the availability of Muslim volunteers.  Given the fact that the amount of time Muslim inmates are allowed to engage in religious activities has been reduced to 16% of that enjoyed by Catholic, Protestant and Jewish makes it clear that a continuation of the Consent Decree is necessary to correct a current and ongoing constitutional violation.

Regulations and policies challenged on grounds that favor one religious group over another must be subjected to strict judicial scrutiny and can be upheld only if the regulation furthers a compelling state interest, that is narrowly tailored to achieving that interest, which interest cannot be achieved through less restrictive means.  *See Williams v. Lara*, 52 S.W.3d 171,

187-88 (Tex. 2001); *see also* Memorandum Opinion and Order at 6, *Scott v. Pierce*, No. H-09-3991 (S.D. Tex., May 7, 2012) *quoting Williams v. Lara*, 52 S.W.3d 171, 187 - 88 (Tex. 2001) ("an overwhelming majority of the courts that have considered an inmate's Establishment Clause challenge have declined to apply a lesser standard in assessing the constitutionality of a prison's actions").   Thus, when it is claimed that a prison regulation violates an inmate's Establishment Clause rights it must be subjected to strict scrutiny analysis and is upheld only if it is "closely fitted" to further a "compelling government interest."   *Larson v. Valente,* 456 U.S. 228, 247 (1982).

The fact that a policy is *facially* neutral is not dispositive of a Establishment Clause constitutional claim.   *See Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 534 (1993) ("the Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination."); the policy must also be neutral in effect and operation. *See also McAlister*, 348 F. App'x 923 at 937; *see also Mayfield*, 529 F.3d at 607 ("we have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion")(omitting internal citations and quotations).   A requirement that all religious services be conducted on Saturdays, for example, would be neutral on its face, allowing Sabbatarians to pray congregationally on their holy day, while prohibiting Muslims from doing so on their sacred day. Similarly, a requirement that all volunteers be clean shaven, while neutral on its face, would clearly disfavor Muslims because the Qur'an mandates that adult males wear beards.

Thus, the facially "neutral" requirement, that all religious activities not supervised by a prison chaplain or guard must have an outside volunteer in attendance, is not constitutionally neutral if, in operation, it means that only Catholic, Protestant and Jewish inmates have access to more than one hour of religious programming per week.   Such is the result that we see here.

There are a substantial number of Protestants in the vicinity of the prison units from which an adequate number of volunteers may be called.

The effect and operation of the volunteer policy on Muslim inmates' access to religious activities, when compared with that enjoyed by Catholic and Protestant inmates, is unconstitutional because it results in the former being able to participate in religious activities one hour per week, while the latter category of inmates have access to six hours or more of religious activities per week.   Hence, the policy, although neutral on its face, violates the Establishment Clause and, therefore, the rights of Muslim inmates by its application.   *See Larson*, 456 U.S. at 247.

### B.      *Free Exercise Clause Violation*

The Court is of the opinion that there is a current and ongoing violation of the "Free Exercise Clause" of the First Amendment to the Constitution of the United States by TDCJ. Unlike the Establishment Clause claim, a Free Exercise claim is subject to the *Safley* analysis. *See Turner v. Safley*, 482 U.S. 78 (1987).   Prison regulations challenged on a free exercise basis are held to be valid if they are "reasonably related to legitimate penological interest."   *Id*. at 89. In making that determination, a court must first consider whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it."   *Id.*   Next, a court must weigh "whether there are alternative means of exercising the right that remain open to prison inmates."   *Id*. at 90.   And, finally, a court must consider the impact that an accommodation of the asserted constitutional right will have on guards and other inmates and the allocation of prison resources generally.   *Id.*; *see also Freeman v. Tex. Dep't of Crim. Justice*, 369 F.3d 854, 860 (5th Cir. 2004).

Using the *Safley* analysis on several occasions, the Fifth Circuit Court of Appeals has upheld TDCJ's volunteer policy, but on a record very different from the one in the present case. In the Court's view, none of those cases are controlling here.  In the first instance those cases were prosecuted by inmates acting *pro se.  See Baranowski v. Hart*, 486 F.3d 112 (5th Cir. 2007); *Adkins v. Kaspar*, 393 F.3d 559 (5th Cir. 2004); and *Odneal v. Pierce*, 324 F. App'x 297 (5th Cir. 2009).  Of note, the Fifth Circuit has recently held that it will not be bound by its rulings in *pro se* prisoner cases, particularly where there is a record of proceedings that distinguishes the case on the facts.  *See,* e.g., *Garner v. Kennedy*, 713 F.3d 237, 244 - 45 (5th Cir. 2013); *Moussazadeh v. Tex. Dep't of Crim. Justice*, 703 F.3d 781, 795 (5th Cir. 2013).  The Fifth Circuit has also recognized that these cases did not "la[y] down *a per se* rule that TDCJ's volunteer requirement could never impose a substantial and, therefore, unconstitutional burden on a prisoner's exercise of religion."  *Mayfield*, 529 F.3d at 614.  In fact, it has refused to uphold the policy on several occasions.  *Id.; see also  Newby v. Quarterman*, 325 F. App'x 345, 353 (5th Cir. 2009); and *McAlister*, 348 F. App'x 923, 934.

The cases where the Fifth Circuit has upheld TDCJ's volunteer policy involved religious sects or groups much smaller than the Muslim sect.  For example, *Odneal* involved Native American inmates, a group that has some 4,418 adherents in the entire TDCJ.  *Baranowski* involved a Jewish inmate, of which there are only 894 in TDCJ.  The *Adkins* case was brought by a member of the Yahweh Evangelical Assembly that has only 33 members in TDCJ.

Case law makes clear that what is constitutionally necessary for access to religious activities, may vary depending on the size of the religious group or sect.  Thus, what must be granted to a smaller religious group is not necessarily the same as what may be available to larger religious groups.  *Baranowski*, 486 F.3d at 123 (Fourteenth Amendment does not require

that every religious group or sect within a prison, regardless of size, have identical access to religious activities); *Adkins*, 393 F.3d 559; *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 336 (5th Cir. 2009).  *See Mayfield*, 529 F.3d at 610.  Therefore, the fact that TDCJ's volunteer program has been found to be lawful as applied to certain smaller religious groups does not foreclose a different result for another sect, particularly a substantially larger sect like the Muslim inmate prisoner population with unique religious practices.

Hence, a determination of the constitutionality of a particular prison policy must be assessed on the basis of the record before the court.  *See Garner*, 713 F.3d at 244 - 45; *Moussazadeh*, 703 F.3d at 795.  If the record is different, or circumstances have changed, prior case law does not control the outcome of a subsequent prison case.  A Free Exercise Claim requires "a case-by-case, fact-specific inquiry to determine whether government action or regulation imposes a substantial burden on an adherent's religious exercise." *Adkins*, 393 F.3d at 571; *McAlister*, 348 F. App'x at 937; *Mayfield*, 529 F.3d 599.

In the case at bar, it is incontestable that TDCJ's volunteer policy imposes a substantial burden on Muslim inmates' practice of the Religion of Islam because it substantially limits the opportunity for Muslims to engage in necessary religious aspects of their faith.  It is also established in this record that Muslim inmates have no alternate way to exercise their religious rights because communal worship and instruction are integral to the practice of their faith. Without sufficient outside volunteers to assist in this endeavor, they are unable to satisfy the minimum requirements of their religion.  The record further establishes that there is no legitimate penological interest furthered by TDCJ's volunteer policy, as applied to the Muslim inmates.

The interests commonly advanced by TDCJ as justification for the direct supervision/volunteer policy are inapplicable here.  First, as to security or safety, this Court has

already held that "TDCJ has no compelling justification for imposing on religion the necessity of a volunteer or other religious figure before inmates are permitted to engage in a worship service."  Order on Compliance Plan at 8, *Scott v. Pierce,* No. H-09-3991 (S.D. Tex. Feb. 22, 2013).  That ruling necessarily eliminates safety or security concerns as a justification for the policy.

Moreover and specifically, this Court held in *Scott* that the requirement that a Chaplain or outside civilian volunteer be present during religious services "is not associated with [TDCJ's] duty to provide security and reduce costs."  *Id.* at 7.  The Court noted that Muslim inmate leader program had been in effect for more than thirty-five years and there were no serious incidents recorded during that entire time.

Finally, the Fifth Circuit has explained that the fact that Muslims regularly engage in communal worship without an approved religious volunteer is some evidence that the security and safety concerns identified by TDCJ can be addressed through less restrictive alternatives.  *See Newby*, 325 F. App'x at 352.  The Fifth Circuit has also noted the persuasiveness of the reported experiences of prison systems of comparable size to Texas with regard to whether prison safety is actually threatened by particular policies relating to religious practices.  *See Garner*, 713 F.3d at 245.

The fact that the *Brown v. Beto* regime was abandoned only as a result of the *Scott v. Pierce* decree and not on account of any security concerns, further demonstrates that the volunteer policy was not adopted to advance any legitimate penological interest.  Moreover, when offered an opportunity to address security concerns in *Scott v. Pierce*, TDCJ opted to ignore the Court and attempted to settle the case with Scott personally for money.  Thus, the record demonstrates that there is no legitimate security interest advanced by prohibiting Muslim

inmates from continuing to participate in inmate-led religious activities without an outside volunteer; that the *Brown v. Beto* indirect supervision regime did not increase security or safety risks in the prison, but instead reduces it; and, that requiring a volunteer, Chaplain, or guard to be present during Muslim religious activities does not enhance the safety or security of the prison institution.

The other interest asserted by TDCJ is cost or resources preservation. This claim does not find support in the record. Requiring the presence of an outside volunteer during religious activities, rather than allowing inmates to congregate without such individuals being present, does not decrease costs but, rather, increases costs. As recorded earlier, TDCJ must devote resources to recruiting, performing background checks, training, coordinating, escorting, keeping records on volunteers and physically searching them before and after each visit. *See DeMoss v. Crain*, 636 F.3d 145, 156 (5th Cir. 2011) (per curiam) (upholding requirement that inmate-led religious services be tape-recorded precisely because not allowing inmate-led, volunteerless activities would "saddle TDCJ with additional administrative costs [and] take staff away from other posts in the prison"). Thus, there is no evidence that the Scott Plan and AD 7.30 impact favorably on prison costs.

No other legitimate penological interest has been suggested by TDCJ. While there are suitable alternatives to TDCJ's policy, there are no alternatives available for Muslim inmates to exercise their constitutional rights because Jum'ah, Taleem and Qur'anic Studies all require communal, congregational activities. Accordingly, the Court holds that there is no constitutionally permissible basis for restricting the Muslim inmates' exercise of their religious practices by requiring an outside volunteer to be present when a Chaplain is unavailable.

Therefore, TDCJ's policy violates the "Free Exercise Clause" of the First Amendment in that it is not reasonably related to achieve a legitimate penological purpose.

### C.     RLUIPA

There is also a current and ongoing violation of the Muslim inmates' rights under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C § 200cc-l(a) ("RLUIPA") by TDCJ.

RLUIPA requires[10] that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –
>
> (1)     is in furtherance of a compelling governmental interests; and
>
> (2)     is the least restrictive means of furthering that compelling governmental interest.

*See* 42 U.S.C. § 2000cc-(a)(1).  RLUIPA imposes a higher burden on the government than does the First Amendment to prove a stronger justification for regulations that impinge on the religious practices of prison inmates.  *Mayfield*, 529 F.3d at 612; *McAlister*, 348 F. App'x at 935.

Under RLUIPA, a plaintiff has the burden of proving that the government's policy substantially burdens his religious exercise.  To accomplish this, the plaintiff must show that the policy requires him to significantly change his religious practices and that the change significantly violates his beliefs.  *Adkins*, 393 F.3d at 570.  Here, the plaintiffs have clearly met that burden.

---

[10]  The defendant admitted in its answers to Requests for Admission promulgated in this case that TDCJ is a department, agency, or instrumentality of the state of Texas which received Federal financial assistance for some portion or aspects of its operations, thereby bringing it within the jurisdictional province of RLUIPA.

Jum'ah is the most sacred event in the Religion of Islam and attendance at Jum'ah is mandatory.  It is obligatory that Muslims attend these congregational meetings weekly - on Fridays - and listen to the congregational sermon because that is the word of Allah.  Moreover, attendance at weekly Jum'ah, Taleem, and Qur'anic studies are all vitally important to the exercise of the Religion of Islam.  *Cf. Lindh v. Warden, Fed. Corr. Inst., Terre Haute, Indiana*, No. 2:09-cv-00215-JMS-MJD, 2013 WL 139699 (S.D. Ind. Jan. 11, 2013) (denying Muslim inmate the ability to participate in daily congregational prayers violated rights under Religious Freedoms Restoration Act, 42 U.S.C. § 2000bb(b)(1)).[11]  Indeed, though not required under RLUIPA, Jum'ah, Taleem, and Qur'anic studies are all central to the practice of the Religion of Islam.  *See Sossamon v. Lone Star State Texas*, 560 F.3d 316, 332 (5th Cir. 2009).

Requiring that a Chaplain, a prison guard, or a religious volunteer be present during all Islamic religious activities, results in Muslim inmates having access to only one hour or less of religious activities per week.  That time is insufficient for Muslims to truly exercise their religion. Therefore, the plaintiffs have demonstrated that application of AD 7.30 and the Scott Plan to Muslim inmates burdens their RLUIPA right and do so in a "substantial" way.

The burden then shifts to TDCJ to prove its justification for the policy.  *Garner*, 713 F.3d at 241 - 42.  In evaluating TDCJ's justification, this Court must consider the realities of prison operations and give "due deference" to prison administrators' judgments on security and allocation of resources.  *DeMoss*, 636 F.3d at 150.  The TDCJ argues that a change from indirect supervision to direct supervision might improve prison security.  This is pure speculation and is not supported by the evidence.  *See Gonzales v. O'Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 436 (2006); *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1318 (l0th Cir.

---

[11]  Although *Lindh* is a RFRA case, RFRA and RLUIPA are "substantially identical with respect to prisoners' entitlements."  *Whitfield v. Illinois Dep't of Corr.*, 237 F. App'x 93, 94 (7th Cir. 2007).

2010).  The record demonstrates that safety is not compromised by adhering to the *Brown v. Beto* regime.  In fact, the evidence establishes that making religious programming less available decreases safety and security in prisons and increases recidivism.  There is no evidence that the presence of a volunteer during a Muslim religious activity at TDCJ increases prison safety or security in any way.   Hence, applying these restrictions does not serve a compelling state interest.

The TDCJ has also failed to demonstrate that discontinuing the *Brown v. Beto* regime and insisting on the volunteer policy furthers a compelling governmental interest.  As to the least restrictive means requirement of RLUIPA, and noted earlier, TDCJ's experience during the thirty-five years of inmate-led services demonstrates that less restrictive means are available and that they fulfill TDCJ's security concerns while not burdening the Muslim inmates' exercise of their religious practices.  *See Newby,* 325 F. App'x at 352; *see also Scott*, No. H-09-3991.

Therefore, the Court holds that TDCJ's volunteer policy, as applied to Muslim inmates, violates the Muslim adherents' RLUIPA rights because it does not advance a legitimate or compelling state interest and is not the least restrictive means of achieving the interests suggested by TDCJ in defense of its Scott Plan.  Finally, there is no evidence demonstrating that AD 7.30 and the Scott Plan are the least restrictive means of furthering TDCJ's interest in security.  History shows that the policy is a "frivolous and arbitrary barrier imped[ing] institutional inmate's religious exercise."  *See Cutter v. Wilkinson*, 544 U.S. 709, 716 (2005).

### D.      *Necessity for Continuation of Consent Decree*

Continuation of the Sections II, III(8) and III(15) of the Consent Decree is necessary to correct the current and ongoing violations of: (1) the First Amendment "Establishment Clause" rights of Muslim inmates to be free from policies that favor inmates of other religions over them;

(2) the First Amendment "Free Exercise" rights of Muslim inmates to practice their religion without restrictions that are not reasonably related to the achievement of a valid penological interest; and (3) the rights of inmates protected by RLUIPA, to be free from substantial burdens on their religious exercise.

The TDCJ has not acted in good faith, but has engaged in a form of hypocrisy. As soon as the statutory stay of the Consent Decree took effect, TDCJ proceeded to implement an unconstitutional and unlawful "volunteer policy" embodied in the Scott Plan. And, it did so without securing Court approval for such a substantial change. More significantly, TDCJ persisted in its unconstitutional practices even after it had been expressly advised by this Court that those policies violated the constitutional rights of Muslim inmates. *See Scott*, No. H-09-3991.

In this context, it is undisputed and the Court holds that the unconstitutional and RLUIPA-violative practices and policies of TDCJ will continue unless provisions II, III(8), and III(15) of the Consent Decree are maintained in full force and effect. Given TDCJ's failure to rescind the application of the Scott Plan as to the Muslim sect, this Court declares it to be violative of the Muslim inmates' constitutional rights as applied.

### E.   *Other PLRA Issues*

In determining whether prospective relief or, presumably, continuation of previously ordered prospective relief should be granted, "the court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C. § 3626(a)(1). The record evinces that the public's safety and safety within the prison system itself, are substantially *enhanced* when inmates are given greater access to religious activities.

To the extent that TDCJ is concerned that it may have to allow adherents of other faith groups to hold inmate-led religious services if it continues to allow Muslim inmates to do so, and that those additional services would burden TDCJ's resources, there is no evidence to substantiate either concern.   Other religious groups may be similarly situated with Muslim inmates in that their religious practices may require more than one hour of communal religious exercise per week and they may be, similarly, unable to procure adequate volunteers to staff these services.   Jehovah's Witness prisoners are similarly situated to Muslims.   Yet, TDCJ has failed to present evidence as to the incremental cost (if any) of providing Jehovah's Witness inmates the same accommodation as Muslim inmates. Rather, TDCJ presented evidence only as to the cost of providing its staff to directly supervise religious services for more than one hour per week for all faith groups, regardless of whether AD 7.30 and the Scott Plan burden those groups' religious exercise.

Continuation of Section II, III(8) and III(l5) of the Consent Decree is also the least intrusive means of correcting the violations identified above.   In fact, the non-intrusiveness of these provisions is made manifest by the fact that the practices commanded by these provisions of the Consent Decree have been successful for more than three decades, and the prison system has never sought to change or terminate them, and has never complained that they are intrusive, in any way, on the prison, its administration, or the prerogatives of TDCJ.

**V.      CONCLUSION**

The Court HOLDS that the plaintiffs and intervenors have made all the showings set forth in 18 U.S.C. § 3626(b)(3), and, as a result, the Consent Decree will not be terminated at this time, consistent with the limitations set forth in that provision of the PLRA.   Accordingly, Sections II, III(8) and III(l5) of the Consent Decree shall remain in full force and effect, and the

defendant's motion to terminate the Consent Decree is Denied with respect to those specific provisions.

It is ORDERED that Consent Decree provisions II, III(8) and III(15) be immediately reinstated and TDCJ is ENJOINED from applying AD 7.30 and the Scott Plan to Muslim and Jehovah's Witness inmates.

SIGNED on this 30th day of April, 2014.

_____
Kenneth M. Hoyt
United States District Judge